Appeal Nos. 2013-1493, -1494, -1509

# United States Court of Appeals

*for the*

# Federal Circuit

———————————

KIMBERLY-CLARK WORLDWIDE, INC.
and KIMBERLY-CLARK GLOBAL SALES, LLC,

*Plaintiffs-Appellants,*

– v. –

FIRST QUALITY BABY PRODUCTS, LLC, FIRST QUALITY RETAIL
SERVICES, LLC and FIRST QUALITY CONSUMER PRODUCTS, LLC,

*Defendants-Cross-Appellants.*

APPEALS FROM THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF WISCONSIN IN CASE NOS. 09-CV-0916 AND 10-CV-1118,
CHIEF JUDGE WILLIAM C. GRIESBACH

## NON-CONFIDENTIAL BRIEF FOR
## DEFENDANTS-CROSS-APPELLANTS

KENNETH P. GEORGE
MICHAEL V. SOLOMITA
BRIAN A. COMACK
MARK BERKOWITZ
AMSTER ROTHSTEIN & EBENSTEIN LLP
90 Park Avenue, 21st Floor
New York, New York 10016
(212) 336-8000

– and –

D. MICHAEL UNDERHILL
MICHAEL A. BRILLE
RICHARD S. MEYER
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, NW, Suite 800
Washington, DC 20015
(202) 237-2727

*Attorneys for Defendants-Cross-Appellants*

Dated: February 12, 2014

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Defendants-Cross Appellants certifies the following:

1.  The full name of every party or amicus represented by us is:

    First Quality Baby Products, LLC, First Quality Retail Services, LLC, and First Quality Consumer Products, LLC

2.  The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by us is:

    None

3.  All parent corporations and any publicly held companies that own 10 percent or more of the stock of any party represented by us are:

    None

4.  The names of all law firms and the partners or associates that appeared for the parties now represented by us in the trial court or are expected to appear in this court are:

    Kenneth P. George
    Ira E. Silfin
    Michael V. Solomita
    Charles R. Macedo
    Michael J. Kasdan
    Brian A. Comack
    David A. Boag
    Mark Berkowitz
    AMSTER, ROTHSTEIN & EBENSTEIN LLP

    D. Michael Underhill
    Michael A. Brille
    Richard S. Meyer
    Neal C. Hannan
    Eric J. Maurer
    Edward Takashima

BOIES, SCHILLER & FLEXNER LLP

Gregory B. Conway
Thomas Wickham Schmidt
LIEBMANN, CONWAY, OLEJNICZAK & JERRY, S.C.

Jose C. Villarreal
Ron E. Shulman
Michael A. Ladra
Lisa Kim Anh Nguyen
David A. Caine
Kalina V. Laleva
Julie M. Holloway
Gregory J. Wallace
WILSON, SONSINI, GOODRICH & ROSATI


Date: February 12, 2014        Respectfully submitted,

                               /s/ Kenneth P. George
                               Kenneth P. George
                               AMSTER, ROTHSTEIN & EBENSTEIN LLP
                               90 Park Avenue
                               New York, NY 10016
                               Phone: (212) 336-8000

# **TABLE OF CONTENTS**

I.   STATEMENT OF RELATED CASES ....................................... 1

II.  INTRODUCTION ................................................................... 1

III. JURISDICTIONAL STATEMENT ................................................ 4

IV.  STATEMENT OF ISSUES ....................................................... 4

V.   STATEMENT OF THE CASE ................................................... 4

VI.  SUMMARY OF THE ARGUMENT ............................................ 7

VII. THE '067 PATENT IS INVALID AS OBVIOUS ....................... 10

    A.   PRIOR ART TRAINING PANTS AND THE '067 PATENT......... 10

        1.   K-C's Prior Art Pull Ups And The LaFleur Patent .................. 10

        2.   The Disclosure And Prosecution Of The '067 Patent ............... 13

    B.   ARGUMENT ..................................................................... 14

        1.   The District Court's Analysis Of The *Graham* Factors
           Followed The Proper Framework ............................... 15

        2.   The District Court Did Not Improperly Shift The Burden......... 17

        3.   K-C's Weak Secondary Considerations Evidence Was
           Insufficient To Overcome The Strong Case Of Obviousness.... 19

VIII. THE DISTRICT COURT CORRECTLY CONCLUDED
     THAT THE '119 PATENT IS INVALID AS ANTICIPATED................. 28

    A.   THE DISCLOSURE AND CLAIMS OF THE '119 PATENT........ 28

        1.   The Asserted Claims Of The '119 Patent ................................. 29

    B.   WETNESS INDICATOR PRIOR ART .......................................... 30

        1.   The Levy Patent........................................................................ 30

C.    THE PTAB'S REJECTIONS OF K-C'S SIMILAR
APPLICATIONS .............................................................. 31

D.    ARGUMENT ...................................................................... 34

1.    The Claimed "Visual Segmentation Element" Is Printed
Matter .......................................................................... 35

2.    The Functional Relationship Between The Printed
Graphics And The Diaper Is To Indicate Wetness ................... 38

IX.   THE DISTRICT COURT CORRECTLY GRANTED SUMMARY
JUDGMENT OF NON-INFRINGEMENT OF THE '221 PATENT .......... 40

A.    THE DISCLOSURE AND ASSERTED CLAIMS OF THE
'221 PATENT ...................................................................... 40

1.    The Disclosure Of The '221 Patent.............................. 40

2.    The Asserted Claims Of The '221 Patent ..................... 47

B.    THE ACCUSED FIRST QUALITY PROCESS ............................. 49

1.    First Quality's Fastening Components Already Face Each
Other When The Pant Is Folded In Half ..................... 49

2.    First Quality Does Not Need Or Use "Z-Direction
Movement" On A Folded Pant...................................... 51

C.    ARGUMENT ...................................................................... 52

1.    The FQ Process Never Has A "Folded Pant" With
"Outward-Facing Fastening Components" And Never
"Inverts" Those Components ..................................... 52

2.    The Court Correctly Found That Claim 15 Was Not
Infringed ...................................................................... 60

3.    K-C Does Not Contest The Court's Finding That First
Quality Does Not Meet The Transporting Step ........................ 67

4.    K-C's Motion To Supplement Was Properly Denied ................ 69

X.    CONCLUSION .............................................................................. 71

## <u>CONFIDENTIAL MATERIAL OMITTED</u>

Pursuant to the Federal Circuit Rule 28(d)(1)(B), material subject to a protective order entered by the United States District Court for the Eastern District of Wisconsin has been redacted from pages 25, 54-56 and 66-70. The redacted portions of the brief contain material that has been designated as confidential by Plaintiffs-Appellants or that is confidential business information of Defendants-Cross Appellants.

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Altiris, Inc. v. Symantec Corp.*,
  318 F.3d 1363 (Fed. Cir. 2003) ...................................................55, 57

*Anderson's-Black Rock, Inc. v. Pavement Salvage Co.*,
  396 U.S. 57 (1969).............................................................................19

*Apple Inc. v. ITC*,
  725 F.3d 1356 (Fed. Cir. 2013) ........................................................18

*Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*,
  776 F.2d 281 (Fed. Cir. 1985) ..........................................................21

*Brown v. 3M*,
  265 F.3d 1349 (Fed. Cir. 2001) ........................................................35

*Celotex Corp. v. Catrett*,
  477 U.S. 317 (1986)......................................................................24, 26

*Cohesive Techs., Inc. v. Waters Corp.*,
  543 F.3d 1351 (Fed. Cir. 2008) ........................................................58

*In re Cyclobenzaprine*,
  676 F.3d 1063 (Fed. Cir. 2012) ...................................................16, 17

*Dow Jones & Co. v. Ablaise Ltd.*,
  606 F.3d 1338 (Fed. Cir. 2010) ...................................................23, 37

*Dynegy Mktg. & Trade v. Multiut Corp.*,
  648 F.3d 506 (7th Cir. 2011) ............................................................70

*Eibel Process Co. v. Minn. & Ont. Paper Co.*,
  261 U.S. 45 (1923).............................................................................24

*Elan Microelectronics Corp. v. Pixcir Microelectronics Co. Ltd.*,
  No. 2:10-cv-14, 2013 U.S. Dist. LEXIS 76983 (D. Nev. May 30, 2013)..........58

*Graham v. John Deere Co.*,
  383 U.S. 1 (1966)........................................................................14, 18

*In re Gulack,*
   703 F.2d 1381 (Fed. Cir. 1983) ............................................................8, 32, 38

*Innovention Toys, L.L.C. v. MGA Entm't, Inc.,*
   637 F.3d 1314 (Fed. Cir. 2011) .......................................................................16

*In re Jie Xiao,*
   462 F. App'x. 947 (Fed. Cir. 2011) ..................................................................39

*John Hopkins Univ. v. CellPro, Inc.,*
   152 F.3d 1342 (Fed. Cir. 1998) .......................................................................22

*In re Jones,*
   54 C.C.P.A. 1218 (C.C.P.A. 1967).............................................................35, 37

*Leapfrog Enters., Inc. v. Fisher-Price, Inc.,*
   485 F.3d 1157 (Fed. Cir. 2007) .......................................................................20

*In re Lowry,*
   32 F.3d 1579 (Fed. Cir. 1994) ....................................................................36, 37

*Merck & Co. v. Teva Pharms. USA, Inc.,*
   395 F.3d 1364 (Fed. Cir. 2005) .......................................................................63

*Newell Cos. v. Kenney Mfg. Co.,*
   864 F.2d 757 (Fed. Cir. 1988) .........................................................................26

*Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.,*
   719 F.3d 1346 (Fed. Cir. 2013) ..................................................................17, 19

*O2 Micro Int'l, Ltd. v. Monolithic Power Sys.,*
   467 F.3d 1355 (Fed. Cir. 2006) .......................................................................69

*Ormco Corp. v. Align Tech., Inc.,*
   463 F.3d 1299 (Fed. Cir. 2006) .......................................................................21

*Orthopedic Equipment Co., Inc. v. All Orthopedic Appliances, Inc.,*
   707 F.2d 1376 (Fed. Cir. 1983) ...............................................................6, 17, 25

*Parallel Networks, LLC v. Abercrombie & Fitch Co.,*
   704 F.3d 958 (Fed. Cir. 2013) .........................................................................69

*Plantronics, Inc. v. Aliph, Inc.*,
   724 F.3d 1343 (Fed. Cir. 2013) ........................................................18

*Process Control Corp. v. HydReclaim Corp.*,
   190 F.3d 1350 (Fed. Cir. 1999) ........................................................52

*Rothman v. Target Corp.*,
   556 F.3d 1310 (Fed. Cir. 2009) ........................................................19

*SIBIA Neurosciences, Inc. v. Cadus Pharma. Corp.*,
   225 F.3d 1349 (Fed. Cir. 2000) ........................................................24

*SRAM Corp. v. AD-II Eng'g, Inc.*,
   465 F.3d 1351 (Fed. Cir. 2006) ........................................................56

*St. Clair Intellectual Prop. Consultants, Inc. v. Canon Inc.*,
   412 F. App'x 270 (Fed. Cir. 2011) ......................................................5

*Sterner Lighting, Inc. v. Allied Elec. Supply, Inc.*,
   431 F.2d 539 (5th Cir. 1970) ..........................................................36

*Stratoflex, Inc. v. Aeroquip Corp.*,
   713 F.2d 1530 (Fed. Cir. 1983) ........................................................25

*Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*,
   699 F.3d 1340 (Fed. Cir. 2012) ....................................................15, 16

*Tyco Healthcare Grp. LP v. Mut. Pharm. Co.*,
   642 F.3d 1370 (Fed. Cir. 2011) ........................................................20

*White v. Dunbar*,
   119 U.S. 47 (1886)....................................................................37

*Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*,
   683 F.3d 1356 (Fed. Cir. 2012) ........................................................17

*Wyers v. Master Lock Co.*,
   616 F.3d 1231 (Fed. Cir. 2010) ........................................................14

**STATUTES**

35 U.S.C. 103 ...................................................................................................18

**RULES**

Fed. R. Civ. P. 56(c)(1)......................................................................24, 26

## I.    STATEMENT OF RELATED CASES

In *Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prods., LLC*, No. 2010-1382 (Fed. Cir.), this Court previously heard the Defendants' (Appellees here) interlocutory appeal of the district court's grant of a preliminary injunction in this case. The panel (Judges Dyk, Friedman, and Prost) affirmed-in-part and vacated-in-part.  *Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prods., LLC*, 431 F. App'x 884 (Fed. Cir. 2011).

One of the patents at issue in this appeal, U. S. Patent No. 6,849,067, is the subject of a pending reexamination proceeding in the Patent and Trademark Office ("Patent Office"), No. 95/001,228.

The parties are litigating Appellants' patent infringement claims on unrelated patents in the United States District Court for the Middle District of Pennsylvania, *Kimberly-Clark Worldwide, Inc. v. First Quality Baby Prods. Inc.*, Case No. 1:09-CV-1685.

Counsel for Appellees are not aware of any other cases in this or other court that will directly affect or be directly affected by this Court's decision in this appeal.

## II.    INTRODUCTION

This appeal is from a patent infringement suit brought by Appellants Kimberly-Clark Worldwide, Inc. and Kimberly-Clark Global Sales, LLC

(collectively, "K-C") against Appellees First Quality Baby Products, LLC, First Quality Retail Services, LLC, and First Quality Consumer Products, LLC (collectively, "First Quality") in the Eastern District of Wisconsin.  The asserted patents relate to refastenable training pants—a disposable undergarment worn by young children—and associated manufacturing methods.  K-C appeals from the district court's grant of summary judgment to First Quality of:  (1) invalidity of Claims 8-10 of the U.S. Patent No. 6,849,067 ("the '067 Patent"); (2) invalidity of U.S. Patent No. 6,307,119 ("the '119 Patent"); and (3) non-infringement of U.S. Patent No. 6,513,221 ("the '221 Patent").

The '067 Patent, directed to a training pant with refastenable side seams (e.g., seams connected by "hook" and "loop" fasteners, such as Velcro®), has been on shaky ground from the outset of this case.  The district court initially refused to grant a preliminary injunction to K-C because it had serious concerns that the '067 Patent was invalid.  (A2271).  After the close of discovery, First Quality moved for a summary judgment that the asserted claims were obvious over the combination of K-C's own prior art training pant and the LaFleur Patent.  (A29).  The district court granted the motion finding that LaFleur recognized the **_identical problem_** (i.e., removing a soiled training pant) and **_taught the identical solution_** as the '067 Patent (i.e., refastenable side seams) more than a decade earlier.  (A38).  K-C does not challenge these findings, but argues that the district court erroneously decided

2

the claims were obvious before addressing K-C's alleged secondary considerations. (Br. 55-56). K-C is wrong. The district court did evaluate K-C's alleged secondary considerations of non-obviousness "[b]efore reaching an ultimate conclusion of obviousness," (A43), but determined that K-C's weak objective evidence "cannot overcome the strong evidence of obviousness illustrated by the prior art." (A50).

The '119 Patent is a similar attempt by K-C to patent what was long known in the prior art—in this case, wetness indicators. The asserted claims of that patent are directed to an absorbent article, such as a training pant, containing printed matter, i.e., "permanent" and "active" graphics, on the outer cover for use in toilet training toddlers. (A53). When wetted, the "active" graphics undergo a visual change, while the permanent graphics do not. (*Id.*). Applying the printed-matter doctrine, the district court found that the claimed invention was anticipated by the prior art Levy Patent, which discloses permanent and active graphics that perform the same wetness indicating function. (A61-62).

The '221 Patent claims one way to perform the final step in a process for manufacturing a refastenable training pant, namely, folding the pant at the crotch and connecting the hook and loop fasteners to "pre-fasten" the pant. (A65-66). The '221 Patent claims that, ***after the pant is folded***, the hook fasteners are inverted so that they face the loop fasteners. The loops are then moved towards,

3

and mated with, the hooks to pre-fasten the pant.  (A70-76).  Because First Quality

does not perform these steps on a folded pant, the district court held that First

Quality's process does not infringe the '221 Patent.  (A72, A76).

## III.    JURISDICTIONAL STATEMENT

Subject matter jurisdiction in the underlying action in the district court was

based on 28 U.S.C. §§ 1331, 1338, as this an action for patent infringement under

35 U.S.C. § 271.  The district court entered final judgment on May 31, 2013.  (A1-

5).  K-C filed a notice of appeal on June 27, 2013 and First Quality filed a notice

of cross-appeal on July 11, 2013. [1]  This Court has jurisdiction under 28 U.S.C. §

1295(a).

## IV.    STATEMENT OF ISSUES

1.     Whether the district court erred in granting summary judgment that

the asserted claims of the '067 Patent are invalid as obvious.

2.     Whether the district court erred in granting summary judgment that

the asserted claims of the '119 Patent are invalid as anticipated.

3.     Whether the district court erred in granting summary judgment that

the asserted claims of the '221 Patent are not infringed.

## V.    STATEMENT OF THE CASE

First Quality manufactures "private label" disposable training pants for

---

[1] On February 11, 2014, First Quality moved to dismiss its cross-appeal (No. 2013-1509).

4

major retailers such as Target, CVS, and Walgreens, who sell them to consumers under their own brand names.  In 2009, First Quality announced its plan to launch a refastenable training pant.

On September 21, 2009, K-C filed its initial complaint alleging that First Quality's refastenable training pants infringed the '067 and '119 Patents.  (A307-10(¶¶7-25)).  K-C immediately moved for a preliminary injunction on the '067 Patent. (A376-9).  The district court denied the motion because of invalidity concerns.  (A2271-73).  After discovery, First Quality moved for a summary judgment of invalidity, arguing that asserted Claims 8-10 of the '067 Patent ("the Asserted '067 Claims") were obvious over the combination of K-C's original version of its Pull-Ups and the LaFleur Patent.  (A15306-12).  The court granted First Quality's motion.  (A51).

First Quality also challenged the validity of the '067 Patent in an *inter partes* reexamination proceeding at the Patent Office.  (A15398-402).  On October 9, 2013, the Patent Office issued a Right of Appeal Notice ("RAN"), rejecting all of the '067 Patent claims and closing prosecution.[2]  (Cntl. No. 95/001,228, 10/19/2013 RAN).  K-C has appealed to the Patent Trial and Appeal Board ("PTAB").

---

[2] This Court may take judicial notice of the reexamination record of the '067 Patent.  *See, e.g., St. Clair Intellectual Prop. Consultants, Inc. v. Canon Inc.*, 412 F. App'x 270, 275 n.1 (Fed. Cir. 2011).

5

When K-C initially sued First Quality, it also asserted that the printed graphics on First Quality's training pant infringed Claims 18-20, 29, and 31 of the '119 Patent ("Asserted '119 Claims"). (A16307-9). K-C did not move for an injunction on the Asserted '119 Claims. After discovery, First Quality moved for summary judgment of invalidity, arguing that, in view of the printed-matter doctrine, the Asserted '119 Claims were anticipated. (A19696-99). The court granted First Quality's motion. (A62).

After its request for a preliminary injunction on the '067 Patent was denied, K-C amended its complaint to assert the '221 Patent and other patents relating to processes for manufacturing refastenable training pants. (A7534-48¶¶56-62). First Quality moved for summary judgment that the accused manufacturing process does not infringe Claims 4, 5, 7, 10, 15 and 16 of the '221 Patent ("the Asserted '221 Claims"). (A17252-54). The district court granted First Quality's motion. (A70-76). K-C sought partial reconsideration of the court's order or, alternatively, for leave to supplement its infringement contentions and expert report to include new infringement theories under the doctrine of equivalents. (A79-82). The court, once again, rejected K-C's infringement arguments. (A81). It also denied K-C's motion for leave, holding that both parties had had a full opportunity to present their positions during fact and expert discovery. (A82).

## VI.    SUMMARY OF THE ARGUMENT

*The '067 Patent:* On appeal, K-C does not challenge the district court's findings that the prior art discloses ***all*** of the limitations of asserted claims and that there was a ***clear motivation*** to combine the prior art teachings.  Nor does K-C disagree with the court's determination that the prior art alone presented a strong *prima facie* case of obviousness.  Instead, K-C argues that the district court improperly performed the obviousness analysis by considering K-C's objective evidence only ***after*** reaching its conclusion of obviousness.  (Br. 55-56).  K-C's arguments are divorced from the court's opinion.  After determining that First Quality presented a strong *prima facie* case of obviousness (A43), the district court evaluated each of K-C's secondary considerations "*[b]efore* reaching an ultimate conclusion of obviousness." (A43).  The court then made its obviousness finding after considering all of K-C's objective evidence, including commercial success and industry skepticism (A44-46), industry acquiescence (A47-48), long felt need and failure of others (48-49), and copying and praise by others (A49-50).  In the end, the court correctly found that K-C's weak objective evidence could not "overcome the strong evidence of obviousness illustrated by the prior art." (A50).  The court's order should be affirmed.

*The '119 Patent:* K-C argues that the district court incorrectly relied on the printed-matter doctrine in determining that the Asserted '119 Claims are

anticipated.  K-C agrees that the prior art discloses the claimed "permanent" and

"active" graphics, but argues that the prior art fails to disclose a separate "visual

segmentation element."  (Br. 44-45).  The '119 Patent illustrates these elements

below:



**Figure 1 of '119 Patent**

According to K-C, the printed matter doctrine does not apply to the "visual

segmentation element"—e.g., the printed border around the dog—because, in other

embodiments not at issue in this case, this element is not printed with ink (e.g., it is

embossed).  (Br. 46-49).  This argument makes no sense.  Because the claims

cover embodiments that undeniably use printed matter (e.g., the hexagon shown

above), the printed matter doctrine applies.

The only remaining inquiry is whether "any new and unobvious functional

relationship" exists between the printed matter (the dog, hexagon, and stars) and

8

the substrate (the diaper). *In re Gulack*, 703 F.2d 1381, 1386 (Fed. Cir. 1983). K-C argues that, even if the printed-matter doctrine applies, the "visual segmentation element" serves a novel function—"facilitate[ing] both a child's [toilet training] instruction and its positive association with the product"—that distinguishes the claimed invention from the prior art. (Br. 49-51). But as the district court correctly concluded, the underlying function of the graphics is simply to indicate that the diaper has been wetted, which was taught in the prior art. (A60-62). The court's order should be affirmed.

**The '221 Patent:** K-C contends that the district court erroneously imposed an "order of steps" on Claim 4 of the '221 Patent. (Br. 28-29). K-C is wrong. Grammar, logic, and the specification all support the court's conclusion that **Claim 4 requires a "*folded pant*"** having *initially* outward-facing fastening components (*i.e.*, that they face away from the inside of the folded pant), and that these initially outward-facing fastening components of the folded pant must be inverted. (A71-72). In contrast, K-C's argument that the steps can be performed in any order excises the term "folded" from the claim.

K-C also claims that the court erred in finding that First Quality's accused process does not include "z-direction" movement of the side panels, as required by Claim 15. (Br. 34-37). Again, K-C is wrong. The district court correctly determined that, "[u]nder the plain meaning of the claim, the movement in the z-

9

direction occurs only ***after*** the folding of the pant chassis." (A75-76 (emphasis added)).  No reasonable fact-finder could possibly find that First Quality's Process includes "z-direction" movement after the pant chassis is folded, which is what the '221 Patent requires  (A75-76).  The court's order should be affirmed.

## VII.    THE '067 PATENT IS INVALID AS OBVIOUS

### A.    Prior Art Training Pants And The '067 Patent

#### 1.    K-C's Prior Art Pull Ups And The LaFleur Patent

As early as 1989, K-C sold a disposable training pant with bonded (non-refastenable) side seams in the United States under the brand name "Pull Ups" (the "Original Pull-Ups").  (A15335-6).  The Original Pull-Ups included an absorbent chassis with front and back waist regions.  (A15648(146:4-13)).  It had a pair of front side panels extending transversely from the front waist region and a pair of back side panels extending transversely from the back waist region.  (A15491; A15649-51(147:6-149:21)).



(A15490).

The front and back side panels were joined together by two bonded (e.g., glued) seams, one on each side of the garment, to form a disposable absorbent article with a waist opening and a pair of leg openings.  (A15491; A15649(147:6-18)).  Each seam extended the entire length of the panels from the waist opening to the respective leg opening.  (A15491).

Training pants with permanently bonded side seams, such as the Original Pull-Ups, made it more difficult for caregivers to remove a soiled pant from the child when the inevitable accident occurred.  (*See* A2271(¶ 32)).  This problem was recognized and solved by the LaFleur Patent, which issued on September 9, 1986.  (A15572-77).

The LaFleur Patent describes various problems associated with non-

refastenable training pants, including that removing a permanently-sealed training pant from a child requires manipulating the child's body through the waist and leg openings of the pant.  (A15574(1:30-37, 2:7-17)).  This was especially disadvantageous because "once a garment has become soiled, removal of the garment can substantially increase the spread of soilage . . . since the garment must be pulled over the child's legs."  (A15574(1:34-37)).

In order to solve this problem, the LaFleur Patent teaches the substitution of refastenable seams for bonded seams.  (A15575(3:58-63)).  Such a training pant can be "easily removed from the child" and "made resealable so that the [training pant] can be worn again" if not soiled.  (A15574(2:7-17)).  Specifically, as shown in figure 5 below (annotated), the refastenable "disposable training panty" 60 of LaFleur includes a "set of overlapping flaps" [i.e., side panels] that extend "from the waist band 14 to the leg band 24."  (A15575(4:20-26)).  The LaFleur Patent further teaches that "[t]he overlapping flap portions are sealed together by mating, hook and pile, fastening strips 52 and 54," such as "velcro fastening strips." (A15575(4:26-29, 3:58-63)).



(*See* A15573(Fig. 5)).

## 2.    The Disclosure And Prosecution Of The '067 Patent

The '067 Patent, entitled "Absorbent Articles With Refastenable Side

Seams," claims priority to an application filed on November 22, 1999, more than a

decade after K-C began selling the Original Pull Ups and the LaFleur Patent

issued.  (A285).

Just like LaFleur, the '067 Patent acknowledges that traditional,

permanently-sealed training pants were difficult to remove.  (A294(1:46-48)), and

states that it would be desirable to have a pant that can "be removed quickly and

easily . . . [especially] when the pant contains messy excrement." (A296(5:44-47)).

The '067 Patent then discloses the use of refastenable side seams, the identical

solution taught by the LaFleur Patent more than a decade earlier,  (A294(1:62-64);

A288(fig. 1)); and the use of the same hook and loop fasteners to form the

13

refastenable seam.  (A294(2:35-37); A302(17:13-45)).  Just like the LaFleur

Patent, the '067 Patent also discloses that refastenable seams allow for easier

removal of "the training pant from the waist of the wearer with reduced risk of

undesirably soiling the clothes or legs of the wearer."  (A294(2:39-43)).

    During prosecution, the Patent Office rejected Asserted Claim 8

(Application Claim 25) as obvious in view of prior art not at issue here.  (A15557-

61).  In response, K-C alleged only a single distinction:  that the refastenable side

seams in the prior art did not "extend[] from the waist opening to each leg

opening," as required by the Claim.  (A15564-5).  The Examiner accepted K-C's

argument.  (A15570).  Thus, the basis for allowance was that the Asserted '067

Claims are directed to a *longer* refastenable seam than that taught by the prior art.

    In opposition to First Quality's summary judgment motion, K-C argued that

the LaFleur Patent did not disclose a refastenable seam that "extends from the

waist opening to each leg opening."  (A35).  The district court disagreed, finding

that "LaFleur . . . clearly depicts a refastenable side seam on a disposable training

pant . . . [that] extends the full length between the waist and leg openings." (A35-

37).  K-C does not appeal this finding.

### B.    Argument

For the reasons below, the district court's order with respect to the '067

Patent should be affirmed.

### 1.    The District Court's Analysis Of The *Graham* Factors Followed The Proper Framework

Obviousness is a question of law based on four underlying factual determinations: "(1) the scope and content of the prior art, (2) the differences between the prior art and the claims at issue, (3) the level of ordinary skill in the art, and (4) any relevant secondary considerations, such as commercial success, long felt but unsolved needs, and the failure of others." *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1237 (Fed. Cir. 2010) (citing *Graham v. John Deere Co.*, 383 U.S. 1, 17-18 (1966)).

The district court determined that the Asserted '067 Claims were obvious over the Original Pull-Ups in view of the LaFleur Patent.  K-C does not dispute the court's findings with respect to the first three *Graham* factors.  K-C also does not dispute that the court evaluated K-C's secondary considerations arguments under the fourth *Graham* factor.  Instead, K-C only takes issue with the *order* in which the court performed its obviousness analysis, claiming that the court made the *ultimate* decision of obviousness of the '067 Patent *"before* considering fully, or at all, the objective indicia of nonobviousness." (A55) (emphasis in original).

K-C's position is irreconcilable with the district court's express statement that "*[b]efore reaching an ultimate conclusion of obviousness* . . . *I must consider any countervailing objective factors* weighing against a finding of obviousness." (A43; *see also id.* ("In determining whether a claimed invention is

15

obvious, the Court *must consider* secondary considerations" of non-obviousness) (emphasis added)).  Only *after* considering K-C's secondary considerations did the court properly concluded that the '067 Patent was obvious.  (A50).

What K-C really takes issue with is that the court made a *prima facie* finding that the Asserted '067 Claims were obvious before considering K-C's secondary consideration arguments.  But a court's identification of "a prima facie case [of obviousness] *is not a conclusion on the ultimate issue of obviousness*." *Transocean Offshore Deepwater Drilling, Inc. v. Maersk Drilling USA, Inc.*, 699 F.3d 1340, 1348-1349 (Fed. Cir. 2012) (emphasis added).  Indeed, this Court's precedent allows the district court to first consider whether, based solely on the patent and prior art, a prima facie case of obviousness has been made, and *then* consider any objective evidence:

> [S]ome [panels of this Court] have spoken of the obviousness analysis in terms of a "prima facie" case which must then be "rebutted" by the patentee.  Under that framework, a court inquires whether the party challenging validity has proven a "prima facie" case of obviousness, based only on reference to the patent and the proffered prior art, and only then considers objective evidence, asking whether such evidence is sufficient to *overcome* the prima facie case.

*In re Cyclobenzaprine*, 676 F.3d 1063, 1076 (Fed. Cir. 2012) (emphasis in original); *see also Innovention Toys, L.L.C. v. MGA Entm't, Inc.*, 637 F.3d 1314, 1323 (Fed. Cir. 2011) ("[S]hould the district court conclude that [defendant] has made out a prima facie case of obviousness based on the [prior art], the court must

16

then determine whether [plaintiff's] secondary considerations ***overcome [defendant's] prima facie case***") (emphasis added).

The district court followed this same framework. It considered the scope and content of the prior art (A34-37), the differences between the prior art and the claimed invention (A37-43), and the level of ordinary skill in the art (A32). Based on these first three factors the court properly found a "***prima facie*** showing of obviousness." (A45); *see Transocean Offshore Deepwater Drilling, Inc.*, 699 F.3d 1340 at 1348-1349 ("The prima facie inquiry is based on the first three Graham factors . . ."). K-C's claim that the court "jumped the gun" and prematurely reached an ***ultimate*** conclusion on obviousness is baseless.

It is evident that K-C's arguments are lifted from this Court's recent *In re Cyclobenzaprine* decision, and are not based on the facts of this case. There, the district court had reached its ultimate conclusion that the invention was obvious before considering the objective factors. *In re Cyclobenzaprine*, 676 F.3d at 1063. That is not what happened here.

### 2.    The District Court Did Not Improperly Shift The Burden

Again, relying, on *Cyclobenzapine*, K-C argues that the district court shifted the burden of persuasion to K-C on the issue of secondary considerations. K-C points to the court's statement that "***countervailing*** objective factors" can be used to "***overcome*** the ***prima facie*** showing of obviousness," and protests that "[t]he

17

objective indicia are not *'countervailing'* considerations." (Br. 56-57 (emphasis added)). K-C's position ignores controlling case law. *See, e.g., Novo Nordisk A/S v. Caraco Pharm. Labs., Ltd.*, 719 F.3d 1346, 1353 (Fed. Cir. 2013) (holding that "it was *entirely appropriate* for the court to next consider whether [patentee's] *countervailing* secondary consideration evidence . . . was sufficient to *'overcome'* [defendant's] prima facie case [of obviousness].") (emphasis added). Indeed, as this Court has held, the use of such terms *"does not shift the burden* from the patent challenger," especially where the fact finder has considered *all* evidence of obviousness and non-obviousness before reaching a *final determination* with respect to obviousness. *See Wm. Wrigley Jr. Co. v. Cadbury Adams USA LLC*, 683 F.3d 1356, 1365 n.5 (Fed. Cir. 2012) (emphasis added).

The district court considered all of K-C's objective evidence, including commercial success and industry skepticism (A44-46), industry acquiescence (A47-48), long felt need and failure of others (48-49), and copying and praise by others (A49-50). Indeed, more than a quarter of the court's twenty-six page opinion is devoted solely to this fourth *Graham* factor. (*See* A43-50).[3]

---

[3] Like the district court, the Patent Office considered, and ultimately dismissed, K-C's evidence of secondary considerations as "insufficient to overcome the rejection of claims 8-10 based upon 35 U.S.C. 103." (Cntl. No. 95/001,228, 10/19/2013 RAN at 120-125).

18

In contrast, the cases K-C cites bear no relation to the facts of this case.  In those cases the courts ***did not analyze*** the secondary considerations evidence.  *See Apple Inc. v. ITC*, 725 F.3d 1356, 1365-66 (Fed. Cir. 2013) (vacating ITC's invalidity decision where the ITC ***"never even mentioned***, much less weighed as part of the obviousness analysis, the ***secondary consideration evidence*** Apple presented") (emphasis added); *Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1355-57 (Fed. Cir. 2013) (reversal warranted where district court "***fail[ed] to provide any meaningful analysis*** for this court's review") (emphasis added).

K-C also conflates the burden of ***persuasion*** with the burden of ***production***. After First Quality presented a prima facie case of obviousness, K-C had "the burden of going forward with rebuttal evidence.  This requirement 'does not in substance shift the burden of persuasion, because the presumption of validity remains intact and the ultimate burden of proving invalidity remains with the challenger throughout the litigation.'"  *Novo Nordisk A/S*, 719 F.3d at 1352.

As discussed below, K-C failed to meet its burden of production and a finding of obviousness correctly followed.

### 3.    K-C's Weak Secondary Considerations Evidence Was Insufficient To Overcome The Strong Case Of Obviousness

K-C's weak objective evidence fell far short of  overcoming First Quality's "strong" prima facie case of obviousness.  (A50).  No reasonable fact-finder could find otherwise.

As this Court recognizes, while secondary considerations are relevant to the obviousness calculus, "a strong prima facie obviousness showing may stand even in the face of considerable evidence of secondary considerations." *Rothman v. Target Corp.*, 556 F.3d 1310, 1322 (Fed. Cir. 2009); *see also Anderson's-Black Rock, Inc. v. Pavement Salvage Co.*, 396 U.S. 57, 61 (1969) ("[Secondary considerations] without invention will not make patentability.") (quotations omitted).

Here, the district court found that the prior art—the Original Pull-Ups in combination with the Lafleur Patent—disclosed each limitation of the Asserted '067 Claims. (A33-37). Notably, the court determined that the LaFleur Patent disclosed the ***only*** purportedly novel aspect of these Claims, a longer refastenable seam. (A34-37) ("No reasonable jury could find that LaFleur does not teach a refastenable seam extending substantially the length from the waist opening to each leg opening."). The district court also found that it would have been obvious to one of ordinary skill in the art to replace the sealed side seam of the Original Pull-Ups with the refastenable seam of the LaFleur Patent, as both LaFleur and the '067 Patent: (a) "sought to address the ***same problem*** posed by training pants with permanently bonded seams: the difficulty of removing the pants in the event of an accident or opening them in order to determine if removal was needed"; and (b) offered the ***same solution*** to this problem: "a refastenable seam comprised of a

hook and loop fastening system extending from the waist opening to each

respective leg opening." (A38 (emphasis added)).

**K-C does not challenge any of these findings**.  (*See* A55-63).  Nor does K-

C contest the district court's holding that the combination of the Original Pull-Ups

with the refastenable seams of the LaFleur patent establishes a strong *prima facie*

case of obviousness.  Consequently, even substantial evidence of secondary

considerations—which K-C did not present—could not overcome the strong *prima*

*facie* case of obviousness of the Asserted '067 Claims.  *Tyco Healthcare Grp. LP*

*v. Mut. Pharm. Co.*, 642 F.3d 1370, 1377 (Fed. Cir. 2011) ("The district court

acknowledged the product's commercial success but properly found that the

evidence as a whole did not overcome Mutual's strong prima facie case of

obviousness.");  *see also Leapfrog Enters., Inc. v. Fisher-Price, Inc.*, 485 F.3d

1157, 1162 (Fed. Cir. 2007) ("[G]iven the strength of the prima facie obviousness

showing, the evidence on secondary considerations," including "substantial

evidence of commercial success, praise, and long-felt need," " was inadequate to

overcome a final conclusion that claim 25 would have been obvious.").

### i.     K-C's Evidence Of Secondary Considerations Lacks A Nexus To A Novel Feature

The district court found that K-C's refastenable training pants

("Refastenable Pull-Ups") were a commercial success. (A44).  The court also

found that "K-C has come forward with sufficient evidence establishing a nexus

between the *refastenable seam* taught in the '067 Patent and the commercial success of K-C's training pant." (A44 (emphasis added)). But, the court properly discounted this evidence because refastenable seams were readily available in the prior art, *i.e.*, the LaFleur Patent. (A45); *see Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311-12 (Fed. Cir. 2006) ("[I]f the feature that creates the commercial success was known in the prior art, the success is not pertinent.").

In the district court, K-C argued that LaFleur did not disclose a full-length refastenable seam. (A35). The court found otherwise and K-C does not challenge that finding on appeal. Thus, K-C effectively concedes that it has failed to show the required nexus between K-C's proffered secondary considerations and a novel feature of the claim. As a consequence, K-C's evidence is legally irrelevant. *See Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 305 n.42 (Fed. Cir. 1985) (finding evidence of long-felt need, unexpected results, and alleged copying not probative absent a showing of a nexus to the merits of the claimed invention). K-C's arguments that the court improperly drew factual inferences against K-C in its analysis of K-C's secondary considerations evidence are therefore legally irrelevant.

Having no answer to the case law on nexus, K-C argues for the first time on appeal that its "evidence of commercial success related to the patented product ***as a whole*** . . . and not to a single feature." (Br. 59 (emphasis added)). Tellingly, K-C

22

cites no evidence in support of this new argument. The absence of evidence is unsurprising in light of K-C's contrary argument in the district court. There, in support of their various requests for preliminary injunctions, K-C argued that success of the Refastenable Pull-Ups was ***exclusively*** due to refastenable side seams. (*See* A20742(¶25-26); A491(¶¶23-24)). And even if K-C had offered new evidence, it should be precluded from raising a new argument now. As "a general rule, an appellate court will not hear on appeal issues that were not clearly raised on proceedings below." *John Hopkins Univ. v. CellPro, Inc.*, 152 F.3d 1342, 1362 (Fed. Cir. 1998). This rule ensures that parties will "not be surprised" on appeal by new issues for which they "had no opportunity to introduce evidence." *Id.*

### ii.    The Court Did Not Draw Any Inferences Against K-C

Although legally irrelevant in view of K-C's concession that LaFleur taught a full-length refastenable seam, K-C is incorrect that the district court drew inferences against K-C. K-C lifts certain statements (e.g., "*seems more likely due to*", "*[i]t may be equally true that*") out of context. (Br. 60-63). In addition, K-C ignores Federal Circuit precedent supporting the court's findings.[4]

---

[4] The Patent Office rejected the same secondary consideration arguments that K-C makes here in the RAN issued in the reexamination of the '067 Patent. (Cntl. No. 95/001,228, 10/19/2013 RAN at 120-125).

### a.    Industry Skepticism/Acquiescence

K-C's only purported "evidence that industry participants were skeptical of the easy-open feature" was a Procter & Gamble ("P&G") television commercial allegedly criticizing K-C's refastenable training pants. (Br. 60).  But because P&G's television commercial criticized the commercial feasibility of refastenable training pants, rather than their "technical merit," the court correctly found that K-C's evidence was entitled to "little weight." (A46); *see Dow Jones & Co. v. Ablaise Ltd.*, 606 F.3d 1338, 1352 (Fed. Cir. 2010) ("[T]he district court correctly characterized [patentee's] reliance on the secondary consideration of market skepticism  as 'weak'" where the evidence proffered did not express any direct skepticism concerning the technical "feasibility" of the claimed invention).

On the issue of industry acquiescence, K-C relies on a handful of alleged *inquiries* concerning the availability of an '067 Patent license.  (Br. 61).  Contrary to K-C's argument, the court did not draw any inferences against K-C regarding these inquiries.  Instead, the court simply found that "K-C *does not offer evidence* that any of those inquiries related specifically to the '067 Patent." (A47 (emphasis added)).  Given this utter lack of evidence, the court properly found that these "generalized inquiries" were not entitled to substantial weight.  (*Id.*); *See* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact . . . is genuinely disputed *must support the assertion* . . .") (emphasis added);  *Celotex Corp. v. Catrett*, 477 U.S.

*Confidential Material Redacted*

317, 325 (1986) (In order to defeat a summary judgment, "the nonmoving party [must] go beyond the pleadings and . . . designate 'specific facts showing that there is a genuine issue for trial.'").

Moreover, evidence of industry acquiescence typically requires substantial licensing activities, as opposed to general inquiries. *See Eibel Process Co. v. Minn. & Ont. Paper Co.*, 261 U.S. 45, 56 (1923); *SIBIA Neurosciences, Inc. v. Cadus Pharma. Corp.*, 225 F.3d 1349, 1358 (Fed. Cir. 2000) (the existence of three licenses was "insufficient to overcome the conclusion of obviousness"). ███

████████████████████████████████████████████████████

████████████████████████████████ Thus, the alleged licensing inquiries are not probative of industry acquiescence.

Rather than address these issues directly, K-C simply points to the court's statement that "there can be industry acquiescence for reasons other than the belief on the part of competitors that the patent at issue is valid." (Br. 61). But as is evident from the order, the court's statement addressed a ***hypothetical*** situation where K-C's evidence was stronger than it was in reality:

> Even ***if*** the evidence of industry acquiescence was stronger, the result would not change.

(A48 (emphasis added)).

### b.    Failure of Others/Long-Felt Need

To establish a "failure of others," K-C had to show that others skilled in the art **_tried_** and **_failed_** to find a solution for the problem that was allegedly "solved" by the '067 Patent.  *See Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1540 (Fed. Cir. 1983).  K-C did not make such a showing.  K-C simply argues that Tyco, First Quality's predecessor, "tried to make a refastenable training pant" in 2006— years after the '067 Patent was filed—but abandoned its attempt.  (A20466).

As an initial matter, any purported "failed" attempts must occur before the filing of the claimed invention.  *See Orthopedic Equipment Co., Inc. v. All Orthopedic Appliances, Inc.*, 707 F.2d 1376, 1382 (Fed. Cir. 1983) (Although the claimed invention achieved the desirable result of reducing inventories, there was no evidence of any **_prior_** unsuccessful attempts to do so).  Thus, Tyco's alleged activities are irrelevant.

Moreover, K-C does not point to a shred of evidence that Tyco ever actually tried (and let alone failed) to make a refastenable training pant.  Indeed, as the court correctly found, the evidence shows only that Tyco "**_considered_** a refastenable training pants design . . . The evidence does not show that Tyco failed, on the technical merits, to design a refastenable seam on the side."  (A49 (emphasis added)).  Tyco's alleged activities are not, for this reason, entitled to any weight.  *See* Fed. R. Civ. P. 56(c)(1); *Celotex Corp.*, 477 U.S. at 325.

In addition, to be legally relevant, a long-felt need must not have been satisfied by another **before** the invention by applicant.  *Newell Cos. v. Kenney Mfg. Co.*, 864 F.2d 757, 768 (Fed. Cir. 1988) ("[O]nce another supplied the key element, there was no long-felt need or, indeed, a problem to be solved . . ."). LaFleur identified the exact same soilage problem as the '067 Patent and offered the identical solution—***facts that K-C does not contest***.  (*See* Br. 23).  While K-C points to the length of time between the issuance of the LaFleur Patent and K-C's commercial launch of its refastenable training pants, K-C fails to mention that many others, including competitors in the marketplace such P&G and SCA Hygiene Products, filed and were issued patents directed to refastenable training pants in the late 1990s, before the '067 Patent was filed. (A3986-97; A4284-4313). Simply put, the need for refastenable seams had been repeatedly satisfied before the '067 Patent was filed.

In sum, as detailed above and in the district court's opinion, invalidity of the '067 Patent due to obviousness is clear as a matter of law.  K-C's contrary arguments are without merit and run counter to well established precedent.  The district court's decision should be upheld.

## VIII.  THE DISTRICT COURT CORRECTLY CONCLUDED THAT THE '119 PATENT IS INVALID AS ANTICIPATED

### A.    The Disclosure And Claims Of The '119 Patent

The '119 Patent relates to absorbent articles such as diapers and training pants, which have graphics printed on the outer cover that indicate "when the child has wet his or her pants."  (A226(1:45-54; 4:30-40)).   As illustrated in Figure 1 below, the graphics of the '119 Patent include a "permanent character graphic" 60 (a dog driving a car) and "active object graphics" 66 (stars). (A233(16:11-27)). Another permanent graphic, a visual segmentation element 64 (a border around the "character graphic"), separates the permanent character graphic from the active object graphics.  (A233(16:52–61)).



**Figure 1 of '119 Patent**

(A217(Fig. 1) (annotated)).

28

When a child wets the diaper, the active object graphics 66 (stars) appear or disappear, while the permanent character graphic 60 (dog) and the permanent visual segmentation element 64 (hexagon) are unchanged.  (A233-4(16:64–17:5)). The child's caregiver can therefore visually ascertain that the diaper is wet.

### 1.    The Asserted Claims Of The '119 Patent

All the Asserted '119 Claims require: (1) an outer cover; (2) an absorbent assembly; (3) a permanent character graphic; (4) an active object graphic; and (5) a visual segmentation element (another permanent graphic).  (A239-240).  The remaining elements relate to the number, size, and positioning of permanent and active graphics. (*Id.*).  Claim 18, which is representative of these five independent claims, is reproduced below with the key limitations highlighted:

> 18.    An absorbent article comprising:
>
> an outer cover having an interior surface and an opposite exterior surface;
>
> an absorbent assembly disposed on the interior surface;
>
> a ***permanent character graphic*** disposed on the outer cover;
>
> an ***active object graphic*** disposed on the outer cover; and
>
> a ***visual segmentation element*** disposed between the permanent character graphic and the active object graphic;
>
> wherein the absorbent article defines a longitudinal centerline and the permanent character graphic and the active object graphic are longitudinally separated by about 20 millimeters or more.

29

(A239(Claim 18)).

### B.    Wetness Indicator Prior Art

#### 1.    The Levy Patent

Just like the '119 Patent, a prior art patent, EP App. Pub 0148115 to Levy ("the Levy Patent"), discloses a disposable diaper having graphics printed on its outer cover which are used to indicate that the child has wet his or her pants. (A19928-A19935).  Figures 3 and 4 of the Levy Patent, reproduced below, show a Mickey Mouse graphic that is printed on a diaper.  Just like the '119 Patent, this graphic includes permanent portions and active portions.



(A19934(Figs. 3, 4 (annotated))).

Specifically, Mickey's ears, right arm, and shirt (element 5) are drawn in permanent ink that does not change when it becomes wet with urine (i.e., a permanent character graphic).  (A19931).  By contrast, Mickey's left arm (i.e., elements 6 and 6'), mouth, eyes and tears are drawn with two different inks that

change when wetted: one becomes visible, the other fades or disappears (i.e.,

active graphics).  (*Id.*).  As a result, Figure 4 shows the diaper when it is not wet

(i.e., Mickey is happy), and Figure 3 shows it when wet (i.e., Mickey is unhappy).

Although the Figures in the Levy Patent use Mickey Mouse, Levy teaches that a

different designs can be used "in order to stimulate the child's interest."  (*Id.*).

### C.    The PTAB's Rejections Of K-C's Similar Applications

During the original prosecution of the '119 Patent, the Examiner did not

apply the printed-matter doctrine.  However, after the '119 Patent issued, K-C filed

other patent applications claiming similar printed graphics, including Application

No. 10/651,354 ("the '354 Application").  This application was ultimately rejected

by the PTAB based on prior art wetness indicating graphics and the "printed-

matter doctrine."

As shown below, the claims of the '354 Application were virtually identical

to the Asserted '119 Claims:

| Claim 1 of the '354 Application | The Asserted Claims |
|---|---|
| An absorbent article | An absorbent article |
| an **outer cover** having an interior surface and an opposite exterior surface | an **outer cover** having an interior surface and an opposite exterior surface |
| an **absorbent assembly** disposed on the interior surface | an **absorbent assembly** disposed on the interior surface |
| a **permanent character graphic** disposed on the outer cover in the first waist region | a **permanent character graphic** disposed on the outer cover |

31

| Claim 1 of the '354 Application | The Asserted Claims |
|---|---|
| an **active object graphic** disposed on the outer cover in the crotch region | an **active object graphic** disposed on the outer cover |

(A19988-A20022; A20038).

The Examiner initially rejected all '354 Application claims based on a K-C patent from the 1970s teaching wetness indicating graphics, U.S. Patent No. 4,022,211 ("the Timmons Patent"). (A19981-84). As shown in Figure 5 of Timmons (reproduced below), the diaper includes printed graphics of building blocks having alphabet letters. (A19876(3:44-51; Fig. 5)). The outline 22 of the alphabet blocks are the "permanent" graphics that do not change when wetted. (A19876(3:41-48)). In contrast, the alphabet letters 16b (i.e., the active graphics) inside the blocks disappear when wetted, as shown in Figure 6 below (see the blocks below dotted line 24). (A19876(3:48-56)).



FIG. 5



FIG. 6

(A19873-4).

After K-C appealed the Examiner's rejection, the PTAB rejected the claims

based on the Timmons Patent and the printed-matter doctrine:

> In determining whether the printed matter imparts patentability to a claimed invention . . . 'the critical question is whether there exists any new and unobvious functional relationship between the printed matter and the substrate.'  *In re Gulack*, 703 F.2d 1381, 1386, 217 USPQ 401, 404 (Fed. Cir. 1983).

(A19729).  The PTAB found that Claim 1 did not satisfy this test because:

> [T]he character graphic and the active graphic of claim 1, *i.e.*, the printed matter, do not have a new and unobvious relationship with the substrate, *i.e.*, the diaper, as ***the printed matter in Timmons, and the printed matter of claim 1 both serve the function of indicating when the diaper has been wet.***

(A19731) (emphasis added).

Following the Board's decision, K-C amended the claims by adding

limitations regarding the number, size, and positioning of the graphics, just like

those in the Asserted '119 Claims.  (A19735-37).  K-C argued that the amended

claims recited a new and unobvious functional relationship between the printed

matter and the substrate under the printed matter doctrine because of the "novel arrangement of graphical elements." (A19740-1). K-C also claimed that the printed "graphics permit[] the caregiver and child to interact with the training pant in a new and useful manner for 'educational' (i.e., training) purposes." (A19741-2).

The Examiner was not persuaded and rejected all claims in view of Timmons and the printed-matter doctrine. (A19746-52). The Examiner found that K-C's added limitations (e.g., relating to the number of graphics) did not change the "functional relationship" between the graphics and the diaper (i.e., to indicate when the diaper is wet). (A19747). The Examiner also rejected K-C's arguments that the printed matter performed an educational or training function because the underlying function of the graphics is to indicate that the diaper has been wetted, which was taught by Timmons. (A19747-48). K-C did not respond to this rejection and the application was abandoned. (A20024).

### D.    Argument

K-C conceded that the prior art discloses the key elements of the Asserted '119 Claims—an absorbent article containing permanent and active graphics that indicated wetness. (A57). K-C relied instead on the claimed "visual segmentation element," another printed permanent graphic, to try to distinguish the claims from the prior art. (A57). The district court rejected K-C's position, finding that "[t]he

34

*visual* segmentation element . . . is *visual* information recorded in a substrate and is functionally equivalent to printed matter." (A60 (emphasis added)).  The district court further found that "the '119 Patent is . . . not conveying any new functionality beyond a wetness indicator which was already present in" the prior art. (A61).

Here, K-C argues that: (1)  the district court erroneously treated the claimed "visual segmentation element" of the Asserted '119 Claims as printed matter; and (2) even if this element is printed matter, a new and obvious relation exists between the graphics and the substrate (i.e., the absorbent article).  Both arguments fail as a matter of law.

### 1.    The Claimed "Visual Segmentation Element" Is Printed Matter

K-C concedes that all figures in the '119 Patent show the visual segmentation element as a printed graphic, but K-C argues that the printed-matter doctrine does not apply because in some other embodiments (not shown in the figures), the visual segmentation element can be "separate materials", "an embossed pattern" or "materials … with differing light reflective properties." (A46-47).  K-C is wrong.

The law does not require that every single embodiment be printed for a finding of anticipation.  *See Brown v. 3M*, 265 F.3d 1349, 1351 (Fed. Cir. 2001) ("When a claim covers several structures or compositions, either generically or as

alternatives, the claim is deemed anticipated if any of the structures or compositions within the scope of the claim is known in the prior art.").  Moreover, there is no requirement that printed matter necessarily be printed with ink.  Instead, any type of "*indicia* whose primary purpose is the conveying of intelligence to a reader" is deemed printed matter.  *In re Jones*, 54 C.C.P.A. 1218, 1223 (C.C.P.A. 1967) (emphasis added).  Thus, whether comprised of a printed graphic, an embossed pattern, or some other combination of materials, the visual segmentation element is printed matter because it serves an *informational purpose*—providing a permanent graphic in connection with the wetness indicating function.  As such, the district court correctly classified these alternate (and irrelevant) embodiments as being "functionally equivalent to printed matter."  *See In re Lowry*, 32 F.3d 1579, 1583 (Fed. Cir. 1994) (describing "printed matter" as that which is "useful and intelligible only to the human mind").

In addition, K-C's position on appeal is inconsistent with its infringement position below.  There, K-C argued that First Quality's *printed graphics* are the "visual segmentation element" of the Asserted '119 Claims.  As shown below, K-C argued that the sand (left) and water (right), which were *printed* on the First Quality training pants, satisfied this claim element:

 

(A16386-89; *see also* A16316-18). If K-C was correct that the "visual

segmentation element" encompasses First Quality's printed graphics, the Asserted

'119 Claims must be subject to the printed-matter doctrine. *See Sterner Lighting,*

*Inc. v. Allied Elec. Supply, Inc.*, 431 F.2d 539, 544 (5th Cir. 1970) ("A patent may

not, like a 'nose of wax,' be twisted one way to avoid anticipation and another to

find infringement.") (quoting *White v. Dunbar*, 119 U.S. 47, 51 (1886)).

Finally, K-C cites *Jones* and *Lowry* for the alleged proposition that "the

printed-matter doctrine applies only to limitations that consist *solely* of printed

matter." (Br. 47 (emphasis in original)). These cases say nothing of the sort. *Jones*

considered a "code disc" containing "pattern areas" for encoding analog

information into digital form. *In re Jones*, 54 C.C.P.A. at 1223. Although this

Court's predecessor found that the claimed "pattern areas" were not printed matter

even though they "might be **produced by** some sort of printing technique," this was

37

because the patterned areas of the disc "produced physical results" (e.g., actuated electrical circuits), rather than simply "conveying . . . intelligence to a reader." *Id.* (emphasis added).

Similarly, in *Lowry*, this Court found that the claimed computer memory system "***requires*** that the information [stored in the memory] be processed not by the mind but by a machine, the computer." *In re Lowry*, 32 F.3d at 1583 (emphasis added). The Court therefore concluded that the "printed matter cases have no factual relevance here." *Id.* In contrast, the visual segmentation member *is* information that is processed by the mind and, therefore, is printed matter.

K-C's "narrow and erroneous conception of what can be considered 'printed matter,'" (A60), finds no support in fact or law and was properly rejected by the district court.

### 2.    The Functional Relationship Between The Printed Graphics And The Diaper Is To Indicate Wetness

For printed graphics to impart patentability to the Asserted '119 Claims, there must be some "new and unobvious functional relationship between the printed matter and the substrate." *In re Gulack*, 703 F.2d at 1386. The first step is to determine the functional relationship between the printed matter (i.e., the permanent graphic, active graphic and visual segmentation element) and the substrate (i.e., the diaper or training pant). The second step is to determine whether this functional relationship is new and unobvious over the prior art.

Application of these steps here is straightforward. The function of the printed graphics is to indicate whether the absorbent article is wet. (A226(1:6-8)). This is accomplished through the use of permanent graphics (*i.e.,* the claimed "permanent character graphic" and "visual segmentation element") and wetness indicating graphics (*i.e.,* the claimed "active object graphics"). The Levy Patent teaches this same functional relationship of indicating wetness. Specifically, (a) the permanent graphics (i.e., the visual segmentation element and permanent character graphics) of the Asserted '119 Claims, like the permanent graphics (e.g., Mickey's right arm, ears, and shirt) of Levy, remain visible at all times; and (b) the "active graphic" of these claims, like the active graphics (e.g., Mickey's right arm, eyes and tears) of the Levy Patent, change appearance to indicate when the article has been wetted. As such, the claimed printed graphics do not have a new and unobvious relationship with the substrate (i.e., the absorbent article).

K-C does not dispute that the prior art taught this functional relationship between the graphics and the substrate. Instead, K-C relies on an alleged functional relationship between the printed visual segmentation element and ***the other printed graphics*** on the outer cover of the training pant (i.e., the permanent graphic and active object graphic). (Br. 49-50). But this is legally irrelevant; the printed-matter doctrine requires that the graphics be compared to the substrate (i.e., the diaper) on which they are printed. Compounding this error, K-C argues that

39

the Asserted '119 Claims recite a new and unobvious functional relationship over the prior art by providing an "interactive training aid" for the child and caregiver. (Br. 50).

K-C's sleight of hand cannot save its claims. "The claimed [article's] function turns **solely** on [its ability to indicate wetness], regardless of what may be printed [on the outer cover of the training pant] or how an individual user subjectively perceive any particular [graphic]." *In re Jie Xiao*, 462 F. App'x. 947, 951 (Fed. Cir. 2011). And, as the district court correctly found, "[t]he Levy Patent also provides the visual tool of a wetness indicator, illustrated by the Mickey Mouse character, that can serve as an interactive training aid for children." (A61-62).

The district court's order should be affirmed.

## IX. THE DISTRICT COURT CORRECTLY GRANTED SUMMARY JUDGMENT OF NON-INFRINGEMENT OF THE '221 PATENT

### A. The Disclosure And Asserted Claims Of The '221 Patent

#### 1. The Disclosure Of The '221 Patent

The '221 Patent discloses and claims one way of carrying out the final steps in a process for making a pre-fastened training pant, such as the training pant described in the '067 Patent. After the training pant is formed, it is folded in half and the fastening components (hooks and loops) are then manipulated so that they

can be connected to pre-fasten the training pant. This claimed process is illustrated

in the Animation submitted as A17383.

Specifically, just prior to folding, the training pant has a front waist region

22 that includes a pair of front side panels 34, and a back waist region 24 that

includes a pair of back side panels 134. The training pant has hook strips 84, 85

located on the **outer** surface of the front side panels 34, and loop strips 82, 83

located on the **inner** surface of the back side panels 134. (A771(9:14-19);

(A273(14:60-64)).



FIG. 5     IMAGE 5

(A17310).

When the pant is folded in half, the hook strips 84, 85 (located on the outer surface) face away from the loop strips 82, 83 (located on the inner surface). (A280(28:13-17); A255(Fig. 13)).  As a result, the hook and loop strips cannot be connected and the pant cannot be pre-fastened.[5]  (*Id.*).



IMAGE 6 *(Based on '221 Patent, Fig. 13)*

(A17311).

The '221 Patent refers to the loop strips 82, 83 as the "initially inward-facing" fastening components because they are positioned "between" the front and back side panels 34 and 134 "when the product is folded in half."  (A279(26:13-22)).  The hook strips 84 and 85 are referred to as "initially outward-facing"

---

[5] Images 6-9 herein are based on Figure 12-14 and 16-18 of the '221 Patent.  These images show a cross-sectional view of the entire pant being processed by the machinery necessary to pre-fasten the pant.  Figures 12-18 are also cross-sectional views, but show only one half of the training pant in the relevant machinery.

fastening components because they face "away" from the loop strips "when the product is folded in half." (*Id.*).

To solve this problem of how to pre-fasten the pant, the '221 Patent first teaches that, after the pant is folded, the outward facing hook strips 84, 85 on the folded pant should be inverted so that the hooks face inwardly, towards the loop strips 82, 83. (A280(28:1-45); A256-61(Figs. 14-19)). Because this "inversion" is done after folding, the '221 Patent teaches that the front side panels 34 and back side panels 134 must be "spaced apart a sufficient [vertical] distance to permit 180 degree inward folding of the initially outward-facing fasteners 84 and 85." (A280(27:15-19)). The necessary vertical spacing and the inversion is shown below in the following graphic, as well as in the Animation:



IMAGE 7 *(Based on '221 Patent, Fig. 16)*

(A17312).

43

Although the hook and loop strips now face each other, they are still

separated from each other and need to be brought together in order to be

connected. Specifically, because there had to be vertical spacing between the loop

strips 82, 83 and the hook strips 84, 85 to allow for inversion of the hook strips of

the folded pant, the hooks and loops are too far apart to be connected to each other.

(A280(27:9-24); A254-60(Figs. 12-18)).

The second part of the solution taught by the '221 Patent is to then move the

loop strips 82, 83 towards the hook strips 84, 85 until they mate. (A280-

281(28:59-29:15)). As shown in the graphic below, this is accomplished by

transporting the back side panels 134 having the loop strips 82, 83 on "side panel

transfer devices 330." (*Id.*).



IMAGE 8 *(Based on '221 Patent, Fig. 17)*



IMAGE 9 *(Based on '221 Patent, Fig. 18)*

(A17313).

This movement of the loop strips toward the hook strips by the side panel transfer devices is also illustrated in the Animation, which is based on Figure 3 of the '221 Patent. (*See* A17383). As shown in Figure 3 below, inverting the hooks and moving the loops into engagement with the hooks occurs while the folded training pant is travelling through the machine (the assembly line) in the machine direction 254.



FIG. 3

IMAGE 10

(A17314).

Specifically, as the folded pant moves in the machine direction (horizontally) the vertical movement of the back side panels on the side panel transfer devices brings the loop strips 82, 83 of the folded pant towards the hook strips 84, 85. (A258-60(Figs. 16-18)). When the loop strips 82, 83 meet the hook strips 84, 85, these fasteners are connected to pre-fasten the pant. (A279(25:21-25)). The vertical movement of the back side panels 134 is independent of the movement of the rest of the training pant (i.e., the front side panels 34, hook strips 84, 85, and absorbent chassis), which is moved along the assembly line on upper

and lower "alignment conveyors" 256, 258.  (A280-81(28:59-29:36); *see also* A17383).

As discussed below, the Asserted '221 Claims of the '221 Patent use the term "machine direction" to describe the direction of the movement of the "folded pant" along the assembly line (horizontal movement), and the term "z-direction" to describe the separate movement of side panels relative to the folded pant (vertical movement).  (A267(1:29-43)).  The "z-direction" is perpendicular to the machine direction.  (A86).



(A17316).

## 2.    The Asserted Claims Of The '221 Patent

The Asserted '221 Claims are Claims 4, 5, 7, 10, 15, and 16 of the '221 Patent.  Claims 5, 7, and 10 depend from independent Claim 4, and Claim 16 depends from independent Claim 15.  Independent Claims 4 and 15 are reproduced below, with key elements for this appeal bolded.

4. A method for making a prefastened and refastenable pant, comprising:

***transporting a folded pant in a machine direction, the folded pant having*** opposite first and second waist regions in facing relation, the first waist region comprising first side panels and the second waist region comprising second side panels, the first side panels comprising initially inward-facing fastening components, and the second side panels comprising initially ***outward-facing fastening components***;

***inverting the initially outward-facing fastening components***;

***transporting the first side panels on side panel transfer devices while the folded pant is transported in the machine direction***;

moving the initially inward-facing fastening components toward the inverted initially outward-facing fastening components while the first side panels are transported on the side panel transfer devices; and

engaging the initially inward-facing and initially outward-facing fastening components.

15. A method for making a pant, comprising:

providing a pant chassis defining a first waist region, a second waist region, a crotch region which extends between and interconnects the waist regions, first side panels disposed in the first waist region and second side panels disposed in the second waist region;

folding the pant chassis about a fold line extending in a lateral direction through the crotch region, thereby positioning the waist regions and first and second side panels in a facing relation;

transporting the folded pant chassis in a machine direction thus defining a pant transport plane and a z-direction perpendicular to the pant transport plane;

***transporting the first side panels on side panel transfer devices while the folded pant chassis is transported in the machine***

*direction*, each side panel transfer device defining a side panel transport path which intersects the pant transport plane;

*moving the first side panels in the z-direction toward the second side panels while the first side panels are transported on the side panel transfer devices*; and

refastenably engaging the first and second side panels; and

further comprising folding the second side panels prior to refastenably engaging the first and second side panels.

### B.    The Accused First Quality Process

K-C alleged that First Quality's accused manufacturing process (the "FQ Process") infringes the Asserted '221 Claims. Because the side panels of First Quality's training pants do not have initially outward-facing fastening components, the "inverting" step (Claim 4) is not required. And because no inverting is needed, there is no need to maintain vertical spacing between the hook and loop fasteners after the pant is folded. Therefore, there is also no need for any z-direction movement of the side panels of a folded pant by side panel transfer devices (Claim 15).

### 1.    First Quality's Fastening Components Already Face Each Other When The Pant Is Folded In Half

When the training pant of the '221 Patent is folded in half, the hook and loop strips do not face each other and therefore cannot be connected to each other. To solve this problem, the '221 Patent inverts the hook strips to face the loop strips *after* the pant is folded in half. In contrast, the FQ Process avoids the problem

altogether because the hook and loop fasteners face each other (i.e., they are all "inward-facing") ***both before and after the pant is folded in half.*** There is therefore no need for inversion, and inversion does not occur.

This is because the FQ Process folds the material that forms the back side panel on an off-line station ***before*** this material is ever attached to the training pant as the side panels, and long ***before*** the training pant is folded in half. (A17320(¶41)). First Quality also uses back side panels that are longer than the front side panels. (A17321(¶44)). As a result, when First Quality attaches these pre-folded back side panels to the training pant, the hooks and loops already face in the inward direction. (A17320(¶41); A17404(296:15-19)). As such, there is no need to then invert either of these fasteners after the pant is folded.



**Step 1: Partially Assembled**
**Training Pant**

**Step 2: Fully Assembled**
**Training Pant**



**Step 3: Folded Training Pant**

### 2. First Quality Does Not Need Or Use "Z-Direction Movement" On A Folded Pant

As discussed above, the need to invert the hooks in the '221 Patent causes other problems. Specifically, because vertical spacing is needed to allow for inversion, the hooks are located too far above the loops. As a result, after the pant is folded, the '221 Patent requires that side panel transfer devices to move the loop strips in the z-direction (vertically) to bring the loops into contact with the hooks, so that they can be mated.

The FQ Process does not need to address any of these problems, because they do not exist in the FQ Process. Since no inverting is required, no vertical spacing is required to allow for inverting and, therefore, no z-direction movement is required after the pant is folded. Instead, when First Quality's training pant is folded in half the hooks and loops are automatically and immediately connected to each other. (A17321-22(¶46)).

51

As a result of these differences, the FQ Process *never* transports a "folded pant having . . . initially-outward facing fastening components" and *never* "inverts [these] initially-outward facing components" as required by Claim 4.  Also, the side panels in the FQ Process are *never* transported on "side panel transfer devices while the folded pant is transported in the machine direction" (Claims 4 and 15) or moved "in the z-direction" while the pant is folded (Claim 15).

### C.    Argument

K-C raises several alleged "errors" by the district court that hinge on the notion that the lower court improperly construed claims during the summary judgment process.  K-C is wrong.  The court simply compared the plain language of the Asserted '221 Claims to FQ's Process and reached the only possible conclusion—that there was no infringement.

### 1.    The FQ Process Never Has A "Folded Pant" With "Outward-Facing Fastening Components" And Never "Inverts" Those Components

First Quality's summary judgment motion explained, and the district court found, that the FQ Process does not infringe Claims 4, 5, 7, and 10 of the '221 Patent because it does not transport a "folded pant" having "outward-facing" fastening components, and because it never inverts the "fastening components" of a "folded pant." (A70).  These conclusions are compelled by the claim language.

Claim 4 requires, among other things, (1) "transporting . . . a ***folded pant*** having . . .initially ***outward facing*** fastening components," and (2) "***inverting the*** initially outward-facing fastening components."  (A283(Claim 4) (emphasis added)).  Thus, the plain language of Step (1) above requires that a ***folded pant*** have ***initially outward-facing*** fastening components (*i.e.*, that they face away from the inside of the ***folded*** pant)*,* and that ***those*** initially outward-facing fastening components become inverted.

Step (2) above further confirms this conclusion.  This step makes clear that it is ***the*** initially outward-facing fastening components on a folded pant that were originally introduced in step (1) that must be inverted.  *See, e.g., Process Control Corp. v. HydReclaim Corp.*, 190 F.3d 1350, 1356 (Fed. Cir. 1999) ("It is clear from the language of the claim itself that the term '***a*** discharge rate' in clause [b] is referring to the ***same*** rate as the term '***the*** discharge rate' in clause [d].") (emphasis added).  Thus, the plain words of Claim 4 require that inverting occur with respect to a folded pant that has initially outward-facing fastening components.

As such, the court correctly held that "the claim language clearly indicates that the initially outward-facing fastening components must be outward-facing when the pant is folded, and not prior to folding."  (A72).  And, since there was no dispute that all fastening components face inward when First Quality's training pant is folded (shown below), the FQ Process "cannot literally infringe Claim 4 of

*Confidential Material Redacted*

the '221 Patent."  (A72; *see also* A23265 (K-C admitting that the FQ Process

transports "a completely *folded pant* with the loop fasteners and hook fasteners

facing towards the *inside* [*i.e.,* inward] of the training pant.") (emphasis added);

A17324-5( ¶¶ 55-58); A17401-3(259:15-261:25)).



IMAGE 4

(A17319).

The following photograph, annotated by K-C's expert, Mr. Sheldon,

confirms this fact. ████████████████████████████

████████████████████████████████████

███████████████████████████████████

██████████████████

*Confidential Material Redacted*



██████████████████████████████████

████████████████████████████

As to the second step of Claim 4, because the hook and loops face each other when First Quality's training pant is folded, these fasteners are never ***inverted*** on the folded pant, as required by the plain language of this claim.

### i. Logic, Grammar And The Specification All Support The Court's Holding

In opposing summary judgment, K-C argued, as it does here, "that First Quality [was] attempting to constrict Claim 4 to a particular sequence of steps" and that the "inverting" step could occur "prior to folding the pant." (A70-71).  The court found that, even applying an "order of steps" analysis,[6] logic, grammar and the specification all "support[] the interpretation that the second side panels have initially outward-facing fastening components that have not yet been inverted when the pant is folded in half." (A71-72).

As the court explained:

In terms of grammar, Claim 4 indicates that the "folded pant [has] . . . second side panels comprising initially outward-facing fastening components." The grammatical construction of Claim 4—"folded pant *having*"—supports the interpretation that the second side panels have

---

[6] Under this analysis, a court , first, looks to the claim language to determine if, as a matter of logic or grammar, the steps must be performed in the order written. *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369-70 (Fed. Cir. 2003).  If not, the court looks to the rest of the specification to determine whether it "directly or implicitly requires such a narrow construction." *Id.*

initially outward-facing fastening components that have not yet been inverted when the pant is folded in half.

(A71). K-C claims that the court's analysis was incorrect for two reasons. First, K-C asserts that the court's "construction reads 'initially' out of the claim." (Br. 31). But K-C's argument hinges on the notion that the "inverting step" can somehow "occur[] before the 'transporting' step." (*Id.*). This can occur only if Claim 4 is completely rewritten. The "transporting" step, which specifies that the "initially outward-facing fastening components" are on a "folded pant," provides the necessary antecedent basis for the subsequent "inverting" step, i.e., inverting **the** initially outward-facing fastening components (on the folded pant).

Second, K-C asserts that "the court's reasoning imposes limitations on a 'folding' step—a step not present in the claim." (Br. 31). That is not true. The court simply gave effect to each word of the claim, including the requirement of "transporting a **folded pant**." By contrast, K-C's reading would excise the word "folded" from Claim 4 and the teachings of the '221 Patent, and allow the inverting step to occur on a pant that is **not** folded. But this is not what the claim says. The district court correctly rejected K-C's proposed construction. *See SRAM Corp. v. AD-II Eng'g, Inc.*, 465 F.3d 1351, 1359 (Fed. Cir. 2006) ("[W]e are powerless to rewrite the claims and must construe the language of the claim at issue based on the words used.").

The district court's conclusion is confirmed by the specification of the '221 Patent, which explains that "initially outward-facing" fastening components face away from the initially inward-facing fastening components in a folded pant:

> ***For purposes of the present invention***, the first fastening components 82 and 83 will be referred to as the initially inward-facing fasteners 82 and 83 because they are positioned between the corresponding left or right side panels when the product is folded in half but prior to formation of the lap seam, and the second fastening components 84 and 85 will also be referred to herein as the ***initially outward-facing fasteners*** 84 and 85 because they are on a surface of a side panel that faces away from the other side panel ***when the product is folded in half*** but prior to formation of the lap seam.

(A279(26:12-22) (emphasis added)).  Thus, the court correctly found that "[t]he specification language shows that the patentee clearly intended to limit the scope of the claim term 'initially outward-facing fasteners' to mean that the fasteners are outward-facing when the pant is folded." (A72).

K-C also claims that the district court focused on "only one embodiment" in the specification, which "is not nearly sufficient to require a particular sequence of steps." (Br. 33).  This statement is obviously wrong.  Where, as here, claim language requires that elements "be performed in the order written," there is no need even to consult the specification.  *Altiris, Inc.*, 318 F.3d at 1369-70.

Notwithstanding K-C's misstatement of the law, every drawing in the '221 Patent that depicts inversion shows it occurring with respect to the outward-facing fasteners of a ***folded pant***.  (*See, e.g.*, A256(Fig. 14); A258(Fig. 16)).  Jason Csida,

a named inventor on the '221 Patent, testified that the "novel piece of this patent is individually controlling the side panels independently," which occurs only "after the product is folded in half." (A17387-88(85:24-86:16)).

On the other hand, the sole alleged support for K-C's claim construction—which reads the word "folded" out of the claim—does not even come from the language of Claim 4. Instead, K-C points to a vague statement in the specification that "[t]he fastening components can be engaged simultaneously or sequentially with folding of the pant." (Br. 32 citing A268(3:29-30)). But this sentence simply means that, ***after the pant is folded***, the left and right side fastening components can either be mated at the same time, or sequentially (e.g., the left side, then the right). (*See* A279(26:6-12 (***"The refastenable seams 88 can be formed simultaneously or sequentially on the right and left sides of the pant 102."***) (emphasis added)). Either way, the plain language in Claim 4 still requires inverting the initially *outward-facing* fastening components of a *folded pant*.[7] It would be legal error to rewrite this Claim to eliminate the word "folded." *Cohesive Techs., Inc. v. Waters Corp.*, 543 F.3d 1351, 1368 (Fed. Cir. 2008)

---

[7] K-C's citation to boilerplate language at the end of the written description fails to overcome the language of the claim and teaching of the specification. *See, e.g., Elan Microelectronics Corp. v. Pixcir Microelectronics Co. Ltd.*, No. 2:10-cv-14, 2013 U.S. Dist. LEXIS 76983, at *41-42 (D. Nev. May 30, 2013).

(noting that claims are interpreted "with an eye toward giving effect to all terms in the claim").

### 2.    The Court Correctly Found That Claim 15 Was Not Infringed

The district court twice found that the plain language of Claim 15 makes clear that a "folded pant chassis" does not exist until after the entire pant has been folded and the side panels are in a "facing relation," a point that K-C conceded. (A75; A80-81).  The court then found that the FQ Process does not infringe Claims 15 and 16 because "movement of the first side panel in the z-direction occurs *before* the pant chassis is folded."  (A76 (emphasis added); A81).

### i.    The Plain Words Of Claim 15 Require That The  Z-Direction Movement Occur After Folding

K-C initially argues that the district court's discussion of alignment of the side panels and the width of the side panels somehow "limit[ed] the claims in light of the perceived purpose served by the invention." (Br. 34-35).  This is simply an attempt to divert this Court's attention from the real issues.  The court's Order speaks for itself—it merely discussed the concepts of alignment and side panel widths in explaining why "there is no need" for z-direction movement in First Quality's process. (A74).  The court's decision was not based in any way on the alignment or width of the side panels. (A75-76).

The district court simply read the relevant portions of Claim 15 (set forth below) in accordance with its plain meaning and then compared the language to First Quality's process.

15. A method for making a pant, comprising . . .

[1] *folding the pant chassis* about a fold line extending in a lateral direction through the crotch region, thereby positioning the *waist regions and first and second side panels in a facing relation*; . . .

[2] transporting the first side panels on side panel transfer devices *while the folded pant chassis* is transported in the machine direction, . . .

[3] moving the first side panels in the *z-direction* toward the second side panels *while* the first side panels are transported *on the side panel transfer devices* . . .

(*See* A66, A73-76 (emphasis added)).  These three steps are intertwined and, read together, make clear that the z-direction movement must occur after folding.

The court properly stated that step [3] requires that "[t]he z-direction movement must occur '*while* the first side panels are transported on the side panel transfer devices . . . .'" (A75 (emphasis added)).  Step [2], in turn, specifies that the first side panels are transported "on [the] side panel transfer devices *while* the *folded* pant chassis is transported in the machine direction."  (A66 (emphasis added)).  And, Step [1] specifies that the folded pant is formed when the pant is folded "through the crotch region" and "the waist regions and the first and second side panels [are] in a facing relation." (A75-76).  Therefore, "[u]nder the plain meaning of the claim, the movement in the z-direction occurs only after the 'folding of the pant chassis about a fold line extending in a lateral direction

61

through the crotch region, thereby positioning the waist regions and the first and second side panels in a facing relation."' (A75).

The court's conclusion is the only one that is consistent with the plain meaning of the words in steps [1]-[3] of Claim 15. K-C does not even try to offer a holistic "interpretation" of these three steps. Instead, K-C reads step [3] in isolation and ignores its interplay with steps [1] and [2]. K-C then claims that step [3]—by itself—merely requires that side panels move in the z-direction **sometime** while they are being transported on side panel transfer devices. (Br. 36-37). The court properly rejected this exact argument. (A75 ("In order to meet the z-direction limitation of Claim 15, more is required than movement of the side panels at some point in the process in a direction perpendicular to the chassis.")).

The district court read the plain words of steps [1]-[3] in Claim 15 in the only way that they can be read, namely, to require that z-direction movement occur **after** folding. By comparison, the actual claim language is completely absent from K-C's analysis. (*See* Br. 37-38). Instead, K-C relies solely on the same two lines of text from the specification, (A268(3:29-30)), which have nothing to do with z-direction movement. (*See supra* Part IX.C.1.i).[8]

---

[8] Actually, there is no z-direction movement in the FQ Process at all. The z-direction is perpendicular to the machine direction, the direction that a pant moves through the assembly-line process. Thus, when the pant (including the front side panels and chassis) moves down the "Upper Triangular Conveyor," the downward (*cont.*)

### ii. The Court Properly Found That A "Folded Pant" Must Have The Waist Regions And Side Panels "In A Facing Relation"

Focusing on the plain language of Claim 15, the district court found that a "'folded pant chassis' does not exist until after the entire pant has been folded and the side panels are in a 'facing relation.'" (A76; *see also* A81 ("The plain and ordinary meaning of 'facing' is 'to meet face-to-face' or 'to stand or sit with the face toward.'")).   The court also recognized that K-C "concedes as much in its response brief, noting that [b]y the plain language of Claim[] . . . 15, a pant or pant chassis is folded when front and back waist regions and/or front and back side panels have a 'facing relation.'"  (A76).

Ignoring the plain language of the claim and its own admissions, K-C asserts that the "court erred by confining the meaning of 'folded pant chassis' to 'completely' folded." (Br. 41).  But K-C's theory is based solely on the testimony of its expert, not the plain language of Claim 15 or the explicit teachings specification.  According to K-C and its expert, *any* amount of folding is allegedly sufficient to satisfy the "facing relation" requirement.  (Br. 39 ("K-C offered expert testimony that . . . a 'folded pant chassis' exists while a portion of the pant is in the folding nip, even before the entire pant passes through the nip.")).  But this is not

---

(*continued*)
movement is actually in the machine direction, not the z-direction as K-C contends. (A17334-5(¶¶88-91)).

what the claim says; K-C wants to change the claim term "folded pant chassis" to say "partially folded pant chassis."

The district court correctly ruled that "it is not sufficient for a small portion of the chassis to be folded, but rather the degree of folding must bring the side panels and the waist regions into a facing relation." (A76). This is because Claim 15 requires that the folded pant have "a fold line … through the crotch region" ***and*** also have "waist regions and first and second side panels in a facing relation." (*See* A66, A73-76). K-C's "partially folded" argument would improperly eliminate the requirement that the waist regions and side panels be in "facing relation." *Merck & Co. v. Teva Pharms. USA, Inc.*, 395 F.3d 1364, 1372 (Fed. Cir. 2005) ("A claim construction that gives meaning to all the terms of the claim is preferred over one that does not do so.").

The '221 Patent specification further supports the district court's finding. Figure 10, below, shows the left side of the folded training pant "***downstream of***" (i.e., after) the ***folding nip***. (A278(23:62-65) (emphasis added)). The training pant 102 is folded "through the crotch region" (not shown) with "the waist regions [22, 24] and first and second side panels [34, 134] in a facing relation," as required by Claim 15. The '221 Patent explains that "***[a]t this point***, the training pant 102 ***has been folded in half*** and is being transported in the machine direction."

(A278(23:65-67) (emphasis added)).  Thus, the specification equates "folded" with completely folded.



**FIG. 10**

K-C also repeats its "seats in a theatre" analogy to support its erroneous claim construction that would cover all degrees of folding.  (Br. 40).  K-C analogizes the front side panels to the seats in a theater and the back side panels to the stage, and argues that customers in seats that are angled with respect to the stage can still see the show because they are "facing" the stage.  (*Id.*).  But even K-C's strained analogy supports the court's non-infringement finding.  First Quality's folding process is shown below:

*Confidential Material Redacted*



Even if one accepts K-C's analogy and pretends that the front side panels are seats in a theater and the rear side panels are a stage, it is readily apparent that no one will see the show. The people sitting in the seats (the front side panels) cannot possibly be said to be in a facing relationship with the stage (the rear side panels).

The district court properly rejected K-C's attempt to redraft Claim 15 and ignore the plain language of this Claim. This Court should do the same.

*Confidential Material Redacted*

### 3.    K-C Does Not Contest The Court's Finding That First Quality Does Not Meet The Transporting Step

Independent Claims 4 and 15 each require that the side panels be transported "***on*** side panel transfer devices ***while the folded pant*** [chassis] is transported in the machine direction."[9] (A283 (emphasis added)).

As discussed above, K-C argued that the vertical portions of the conveyors that First Quality uses to fold its training pants are the claimed "side panel transfer devices." (*See* A23303-4(¶¶70-71)). But the district court correctly found that in First Quality's process, the vertical portions of the conveyors (i.e., the alleged side panel transfer devices) never transport side panels of a folded pant:

> ***By the time the pant chassis is completely folded*** bringing the side panels and the waist regions in a facing relation, ***the side panels are no longer on the vertical portion*** of the upper conveyor.

(A75-76 (emphasis added)). ███████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████████

---

[9] The word "chassis" appears only in Claim 15.

*Confidential Material Redacted*



Because K-C does not challenge the above factual finding, the transporting requirement of Claims 4 and 15 (i.e., that the side panels be transported "***on*** side panel transfer devices ***while the folded pant*** is transported in the machine direction") is not met.



*Confidential Material Redacted*

### 4.    K-C's Motion To Supplement Was Properly Denied

K-C alleges that the district court "abused its discretion" in denying K-C's

request to amend its infringement contentions and expert report. (Br. 41-44). This

argument is based on the faulty premise that K-C was blindsided by a new claim

construction that it never anticipated. (Br. 41-42). This is not true. The parties

addressed all issues decided by the court during fact and expert discovery.

First Quality's non-infringement contentions unambiguously explained that

the FQ Process does not infringe Claims 15 and 16 because "the first (front) side

panels of the ***folded pant*** are not moved in ***the z-direction while*** transported on the

alleged side panel transfer device . . . . ████████████████████

████████████████████████████████████████

████████████████████████████████████

K-C's expert, Mr. Sheldon, responded to First Quality's contentions in his

expert report, arguing that "[t]here is no restriction in the claim language that the

training pant be ***completely folded.***" (A24977-78(¶ 350) (emphasis added)). Mr.

Sheldon also conceded at his deposition that in First Quality's process, the product

"goes into the Z direction ***before*** it is folded." (A24986(404:8-23) (emphasis

added)).

In his rebuttal report, First Quality's expert, Mr. Gardner, opined that the

"clear words" of the "folded pant chassis" limitation require that the side panels

*Confidential Material Redacted*

and waist regions must be in a "facing relation." (A24991-99(¶¶138-148, 197-210)).  Mr. Gardner also opined that:

> [U]nder the **plain language of Claim 15**, the ***z-directional movement*** must take place on a ***folded pant***. . . .

(A25000(¶¶248-250) (emphasis added)).

While Mr. Sheldon raised doctrine of equivalents arguments relating to other infringement positions taken by Mr. Gardner (and First Quality), Mr. Sheldon (and K-C) elected not to make any doctrine of equivalents arguments with respect to the z-direction limitation.  K-C offers no justification at all for its failure to make a doctrine of equivalents argument during fact and expert discovery, which closed over a year before K-C sought to amend its contentions and submit a new expert report.  In short, K-C was on notice of First Quality's position for years, and the district court's ruling came as no surprise.  The district court's denial of K-C's request for a do-over should be affirmed.  *See Parallel Networks, LLC v. Abercrombie & Fitch Co.*, 704 F.3d 958, 971 (Fed. Cir. 2013) ("We agree with the district court that Parallel is seeking to amend its infringement contentions in order to make arguments that could have been made before the entry of summary judgment, a tactic that the district court correctly held to be improper."); *O2 Micro*

*Int'l, Ltd. v. Monolithic Power Sys.*, 467 F.3d 1355, 1367-1368 (Fed. Cir. 2006) ("Given O2 Micro's delay in moving to amend its infringement contentions and its lack of adequate explanation for this delay, we conclude that the district court did not abuse its discretion in finding a lack of diligence and therefore a lack of 'good cause.'"); *Dynegy Mktg. & Trade v. Multiut Corp.*, 648 F.3d 506, 514-15 (7th Cir. 2011) (affirming court's finding that to "allow [moving party] to make late disclosures now, after a lengthy discovery process, would prejudice" opposing party).

## X.    CONCLUSION

For these reasons, First Quality respectfully requests that this Court affirm the district court's grant of summary judgment that: (1) the '067 Patent is invalid as obviousness; (2) the '119 Patent is invalid as anticipated; and (3) the '221 Patent is not infringed.

Dated: February 12, 2014                    Respectfully submitted,

                                            /s/ Kenneth P. George
D. Michael Underhill                        Kenneth P. George
Michael A. Brille                           Michael V. Solomita
Richard S. Meyer                            Brian Comack
Boies, Schiller & Flexner LLP               Mark Berkowitz
5301 Wisconsin Ave., N.W., Suite 800        Amster, Rothstein & Ebenstein LLP
Washington, DC 20015                        90 Park Avenue
Telephone: (202) 237-2727                   New York, NY 10016
Facsimile: (202) 237-6131                   Telephone: (212) 336-8000
                                            Facsimile: (212) 336-8001
                                            kgeorge@arelaw.com

*Counsel for First Quality Baby Products, LLC, First Quality Retail Services, LLC
and First Quality Consumer Products, LLC*

## CERTIFICATE OF FILING AND SERVICE

# United States Court of Appeals
# for the Federal Circuit

*Kimberly-Clark Worldwide v. First Quality Baby Products,* 2013-1493

## CERTIFICATE OF SERVICE

I, Maryna Sapyelkina, being duly sworn according to law and being over the age of 18, upon my oath depose and say that:

Counsel Press was retained by AMSTER ROTHSTEIN & EBENSTEIN, Attorneys for Defendants-Cross-Appellants to print this document. I am an employee of Counsel Press.

On the **12th Day of February, 2014**, counsel for Defendants-Cross-Appellants has authorized me to electronically file the within **Brief for Defendants-Cross-Appellants (Confidential and Non-Confidential versions)** with the Clerk of the Court using the CM/ECF System, which will serve via e-mail notice of such filing to any of the following counsel registered as CM/ECF users:

Sidley Austin LLP
Bank One Plaza 1 South Dearborn Street
Chicago, IL 60603
312-853-7000

Banner & Witcoff, Ltd.
Ten South Wacker Drive
Chicago, IL 60606
312-463-5000

Godfrey & Kahn, S.C.
780 North Water Street
Milwaukee, WI 53202
414-273-3500

*Attorneys for Plaintiffs-Appellants*

Upon acceptance by the Court of the e-filed document, six paper copies will be filed with the Court, via Federal Express, within the time provided in the Court's rules.

February 12, 2014

/s/ *Maryna Sapyelkina*
Maryna Sapyelkina
Counsel Press

## CERTIFICATE OF COMPLIANCE
## UNDER FEDERAL RULE OF APPELLATE
## <u>PROCEDURE 32(a)(7) AND FEDERAL CIRCUIT RULE 32</u>

1.  This brief complies with the type-volume limitation of Federal Rule of

Appellate Procedure 32(a)(7)(B) or Federal Rule of Appellate Procedure 28.1(e).

   X    The brief contains <u>13,922</u> words, excluding the parts of the brief

        exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii),

        or

        The brief uses a monospaced typeface and contains ___ lines of text,

        excluding the parts of the brief exempted by Federal Rule of

        Appellate Procedure 32(a)(7)(B)(iii).

2.  This brief complies with the typeface requirements of Federal Rule of Appellate

Procedure 32(a)(5) or Federal Rule of Appellate Procedure 28.1(e) and the type

style requirements of Federal Rule of Appellate Procedure 32(a)(6).

   X    The brief has been prepared in a proportionally spaced typeface using

        <u>Microsoft Word 2003</u> in a <u>14 point Times New Roman</u> font, or

        The brief has been prepared in a monospaced typeface using _____

        with ____ characters per inch ____ font.

February 12, 2014          By: <u>*/s/ Kenneth P. George*</u>
                             Kenneth P. George
                             Counsel for Appellees